**Marion F. GOODMAN, Petitioner,**

v.

**PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 11, 1997.

Decided June 4, 1997.

Norman M. Wilson, Jr., Hatboro, for petitioner.

Cynthia A. Fillman, Assistant Counsel, Harrisburg, for respondent.

Before COLINS, President Judge, KELLEY, J., and LORD, Senior Judge.

COLINS, President Judge.

Marion F. Goodman (Petitioner) petitions for review of an order of the Secretary of the Pennsylvania Department of Public Welfare (Department) that affirmed a decision of the Department's Office of Hearings and Appeals (OHA) that, in turn, affirmed a welfare hearing officer's determination that the Bucks County Assistance Office (BCAO) and the Bucks County Area Agency of Aging (AAA) properly denied medical assistance/nursing home care benefits (MA/NHC) to Petitioner. We vacate and remand.

Petitioner, who is currently eighty-four years old, became a resident of Leader Nursing Home in Yardley, Pennsylvania (Leader), after an inpatient hospital stay and a short stay in another nursing home. After being a private-pay resident at Leader for two and one-half years, Petitioner applied for MA/NHC upon the exhaustion of her funds. In

support of her application, Petitioner submitted a medical evaluation form known as an MA51[1], completed by her physician, Louis J. Gringeri, D.O., on December 1, 1994. In the MA51, Dr. Gringeri diagnosed Petitioner as having chronic obstructive pulmonary disease, congestive heart failure, hypertension, coronary artery disease, and gait dysfunction. He recommended that Petitioner be provided with an "intermediate" level of care, which is the level of care Petitioner has received while at Leader. In a second MA51, completed March 13, 1995, Dr. Gringeri repeated his recommendation that Petitioner continue with intermediate care at Leader and added that Petitioner suffers from anxiety.[2]

Personnel from AAA, including a care manager and a registered nurse, met with Petitioner on several occasions, as well as with her son, and reviewed Petitioner's nursing home records and the MA51s. The AAA's evaluation concluded that Petitioner did not require intermediate care, which entailed the presence of 24–hour nursing staff, but that she could function just as well in a personal care home where Petitioner would have supervision but not a 24–hour nursing presence.[3] This evaluation, together with the medical record, was reviewed at the request of AAA by Scott S. Levy, M.D., who concluded that Petitioner would do well in a personal care home and that there was no evidence that Petitioner had need of skilled nursing care. Because AAA determined that Petitioner did not require intermediate care, Petitioner's application for MA/NHC was denied by BCAO.[4] Petitioner appealed this determination.

At a telephone hearing before a welfare hearing officer, the Department provided the testimony of the care manager and registered nurse who had met with Petitioner and reviewed her records, as well as the testimony of a care manager supervisor and the director of the pre-admission unit of the AAA and the casework supervisor of BCAO. Petitioner testified on her own behalf and also presented the testimony of her adult son. Although personnel from Leader appeared with Petitioner at the hearing, for reasons not explained they did not testify. Admitted into the record were, among other things, the two MA51s, the AAA evaluations, letters from Dr. Gringeri, a letter from Dr. Levy, and Petitioner's records from Leader. The documents submitted to the hearing officer

---

1. The MA51 is the medical assessment form used by the Department for determining eligibility for medical assistance.

2. The second MA51 was completed for a re-evaluation by the AAA requested by Petitioner's son.

3. The Department's regulations define "intermediate care" as follows:

> Intermediate care—A level of care provided by a facility that is licensed by the Department of Health to provide intermediate care. Intermediate care shall be ordered by, and provided under the direction of a physician. It is available on a continuous 24–hour basis to a person who does not require the degree of care and treatment provided in a hospital or skilled nursing facility. Because of a mental or physical disability, the person does, however, require nursing and related health and medical services in the context of a planned program of health care and management. The term does not include intermediate care for the mentally retarded.

55 Pa.Code § 1181.2.

> PCH—personal care home—A premise in which food, shelter and personal assistance or supervision are provided for a period exceeding 24 hours for four or more adults who are not relatives of the operator, who do not require the services in or of a licensed long-term care facility, but who do require assistance or supervision in matters such as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self-administration.

55 Pa.Code § 2620.3.

4. Title XIX of the Federal Social Security Act, 42 U.S.C. §§ 1396–1396v, established the Medical Assistance Program (Program) in which Pennsylvania participates under its Plan for Medical Assistance. The Program provides for reimbursement for nursing care services to individuals qualifying for medical assistance. Under the Department's regulations, this includes individuals who receive institutional care for skilled nursing home or intermediate care as prescribed by a physician. *See Harston Hall Nursing and Convalescent Home, Inc. v. Department of Public Welfare*, 99 Pa.Cmwlth. 475, 513 A.2d 1097 (1986). MA/NHC is apparently not available for less than intermediate care. Before an individual can be admitted into a facility for intermediate care, however, an interdisciplinary team of health professionals must make a comprehensive medical and social evaluation. 55 Pa.Code § 1181.53(b)(3).

by AAA and BCAO were yellow highlighted as to those matters generally relied upon by AAA and BCAO, with the notation that the highlighting was done for the AAA's reevaluation. (*See* Exhibit C5.)

The parties painted two very different portraits of Petitioner at the hearing. The welfare hearing officer summarized the AAA's testimony as follows:

> The AAA testified that the [Petitioner] performs all Activities of Daily Living (ADL's) independently and safely without assistance although she needs some assistance with dressing/changing of clothes. She is ambulatory and navigates to the rest room with her walker; sometimes without her walker. She is bowel and bladder continent, according to the AAA, who further testified that she is alert/lucid, with an occasional memory lapse, and has experienced no exasperation [sic] of her cardiac or respiratory conditions.

(Adjudication of welfare hearing officer, p. 3.)

Petitioner, on the other hand, emphasized the seriousness of Petitioner's underlying pathologies and presented a woman who demonstrated extensive confusion and memory loss, who is not oriented as to place or time, who did not know the address or name of the facility where she is living, who expressed a desire to return to the home that had been sold many months before, who did not know the purpose of the hearing she was attending, who forgot that her son and her attorney had visited her the previous day, and who could not walk far without becoming weak and trembling.[5] (*See, e.g.,* N.T., pp. 79–85, 87–88, 94–95.)

■ The discrepancy of views is highlighted by the very different assessments and recommendations made by Drs. Levy and Gringeri. Dr. Levy wrote:[6]

> Clearly [Petitioner] is a lady with multi-organ system involvement, including con-

gestive heart failure, coronary artery disease, and COPD. It appears she has been quite stable for some time and in fact has not required hospitalization in more than two years. It appears [Petitioner] has received quite excellent care at the Leader Nursing Facility, however, it is evident [Petitioner] would do equally well at a personal care unit and I cannot find any evidence of a need for skilled nursing care.

(Letter of Scott S. Levy, M.D., to AAA, May 5, 1995; Exhibit C–7.)

Dr. Gringeri, on the other hand, stated, in addition to his recommendations set forth in the MA51s:

> Because of Mrs. Goodman's severe short term memory deficit, lack of mobility, and serious underlying pathology (currently controlled by careful monitoring and medication) of nephrosis, congestive heart failure, hypertension, coronary artery disease, chronic obstructive pulmonary disease and anxiety, it is essential to her medical well-being that she remain in [intermediate care] at Leader Nursing Home, where she has been a resident since 1992. To take this 83 year old woman out of her familiar surroundings and away from her medical support under these circumstances would be, in my judgment, a serious mistake and could have grave consequences for her physical and emotional health.

(Letter of Louis J. Gringeri, D.O., to AAA, July 18, 1995, supplementing Dr. Gringeri's earlier letter dated March 13, 1995; Exhibit A–3.)

Without making relevant findings of fact,[7] the welfare hearing officer concluded that the BCAO and the AAA acted properly in denying MA/NHC benefits to Petitioner and that Petitioner's needs could be met in a personal care facility instead of a nursing home. Petitioner then charted through the layers of the

---

5. The evidence is undisputed that Petitioner traverses the hallways in Leader by means of a wheelchair. The MA51s indicate that Petitioner is "Wheelchair/Mobile."

6. A physician's statement, although hearsay, is admissible in Department cases regarding the appropriate level of care for a person on or applying for MA/NHC. *Grkman v. Department of*

*Public Welfare*, 161 Pa.Cmwlth. 597, 637 A.2d 761 (1994).

7. The findings of fact set forth in the welfare hearing officer's adjudication pertain only to background and procedural matters. In his "Discussion," the hearing officer briefly summarized some of the evidence presented and then immediately stated his conclusion.

Department's appeal process and, not meeting with success, petitioned this Court to review the denial of MA/NHC benefits. In support of her petition, Petitioner argues (1) that the Department erred by failing to give weight to Petitioner's physical and mental impairments and the detrimental effect a change to a new home with a lesser availability of care will have upon her, and (2) that the Department erred by ignoring the strong recommendation of Petitioner's treating physician that Petitioner remain in intermediate care. Petitioner's second argument sets forth a request that this Court adopt for the present case the "treating physician rule" used by the Second Circuit Court of Appeals in Social Security Disability benefits cases.[8]

■ This Court's scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed, or necessary findings are not supported by substantial evidence. *Grkman v. Department of Public Welfare*, 161 Pa. Cmwlth. 597, 637 A.2d 761 (1994). Our review, however, is significantly hampered by the fact, noted above, that the welfare hearing officer articulated no findings of fact or credibility determinations necessary to support a conclusion in this case. A very brief summary of the evidence followed by a conclusion that the AAA and BCAO acted properly in their determination leaves very little for effective appellate review. This Court may not make factual findings or credibility determinations. Nor will we infer credibility because one party prevailed.

> If ... *specific* credibility determinations do not appear in the factual findings, in the discussion or conclusions, and no other *specific* explanation for the adverse determination appears in the adjudication, then we have no other alternative but to vacate the order below and remand for specific credi-

bility findings and for an explanation of the agency's decision; otherwise we could not perform our appellate review function.

*Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa.Cmwlth. 92, 525 A.2d 841, 844 (1987)(emphasis in original).

We note further that this case is more complicated than simply accepting one party's version of the facts, as each party essentially presented what it found supportive without addressing some of the salient issues raised by the other party. For example, AAA and BCAO did not squarely present evidence that refuted Dr. Gringeri's belief that removing this elderly Petitioner with a host of very serious underlying pathologies from her familiar surroundings, and from the medical support available at Leader to monitor his prescribed treatments and procedures, could cause grave consequences for the Petitioner's physical and *emotional* health.[9] Other issues, however, are squarely at odds, notably Petitioner's mental condition and ability to get around, where AAA determined her to be lucid with occasional memory lapses and ambulatory while Dr. Gringeri characterized her as having a severe short-term memory deficit and a lack of mobility. Further, Petitioner made a demonstration of her mental condition before the hearing officer, which demonstration allows for a credibility determination.

Accordingly, the order of the Secretary of the Department must be vacated, and this matter must be remanded with instructions that it be further remanded to the welfare hearing officer to make necessary findings of fact and credibility determinations and, based upon these matters, conclusions of law.[10] The hearing officer must decide whether the facts regarding Petitioner's situation fit within the Department's definition of

---

**8.** Essentially, the treating physician rule provides that the treating physician's opinion concerning medical disability is binding unless contradicted by substantial evidence; and even where there is contrary evidence, the treating physician's opinion is entitled to extra weight. *See, e.g., Schisler v. Heckler*, 787 F.2d 76 (2d Cir.1986).

**9.** It is interesting to note that AAA testified that they did not have this letter from Dr. Gringeri in arriving at its decision, as the decision was made in April, 1995, and the letter was mailed to AAA

in July, 1995. (N.T., p. 105.) Unfortunately, the record does not indicate why AAA did not re-evaluate its position because of this letter or why it was discounted.

**10.** The welfare hearing officer is the finder of fact in public assistance cases. 55 Pa.Code § 275.4(h); *Northwestern Institute of Psychiatry v. Department of Public Welfare*, 99 Pa.Cmwlth. 213, 513 A.2d 495 (1986).

intermediate care, *i.e.*, whether Petitioner has a mental or physical disability that requires "nursing and related health and medical services in the context of a planned program of health care and management." 55 Pa.Code § 1181.53(b)(3). Petitioner indisputably has serious underlying pathologies for which Dr. Gringeri has set forth prescribed treatments in the MA51s, including a "special procedure for health and safety" set forth in the second MA51 that, from this Court's layman's perspective, is undecipherable. (*See* Exhibit A–1.) If this evidence is credible, does it demonstrate a situation that meets the definition of intermediate care? It would also be edifying for the welfare hearing officer to explore under any applicable law the practical effects of his decision. Petitioner's son testified that he looked into several personal care homes for his mother's placement (from a list provided by AAA) but that a number of them were not interested in accepting a woman in her condition. (N.T., pp. 98–99.) In the event it is finally determined that Petitioner does not presently qualify for MA/NHC, and thus presumably must leave Leader, it may be important to establish the responsibilities of the various parties in finding appropriate (medically and otherwise) placement for Petitioner. In short, this is a serious matter that requires an appropriate exploration and evaluation of all of the facts presented before the Department. Moreover, the Secretary of the Department and the director of OHA are empowered to remand this matter for additional findings of fact if necessary. 55 Pa.Code § 275.4(h)(4).

◼ Regarding Petitioner's request that this Court adopt the treating physician rule used by the Second Circuit Court of Appeals in certain cases, we find no basis to do so. (Petitioner cites no Pennsylvania authority.) It goes without saying, however, that medical evidence and opinion in cases of this type are critical, if only to make adequate factual findings for determining the appropriate level of care.

### ORDER

AND NOW, this 4th day of June, 1997, the order of the Secretary of the Pennsylvania Department of Welfare in the above captioned matter is hereby vacated, and this matter is remanded to the Secretary with instructions that the matter be further remanded to the welfare hearing officer to make necessary findings of fact, including credibility determinations, with regard to the evidentiary issues presented, and from these to draw appropriate conclusions of law.

Jurisdiction relinquished.